**O**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 ℭ𝔬𝔲𝔯𝔱
# ℭ𝔢𝔫𝔱𝔯𝔞𝔩 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 ℭ𝔞𝔩𝔦𝔣𝔬𝔯𝔫𝔦𝔞

| | |
|---|---|
| JORGE ENRIQUE SERRANO ROBLES, SENIOR, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF LOS ANGELES, et al., <br><br> Defendants. | Case № 2:20-cv-06648-ODW (PLAx) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [55]** |

## I.     INTRODUCTION

Plaintiffs Jorge Enrique Serrano Robles, Sr. and Yurida Dolores Miranda bring this excessive force action individually and as successors in interest to their son, Jorge Enrique Serrano, Jr. ("Serrano")—against Defendants the County of Los Angeles (the "County"), the Los Angeles County Sheriff's Department ("LASD"),[1] Sheriff Alex Villanueva, and Deputy Nikolis Perez—based on allegations that LASD Deputies used unreasonable deadly force when they shot and killed Serrano.  Defendants move for summary judgment on all nine of Plaintiffs' claims.  (Mot. Summ. J. ("Mot." or

---

[1] On August 30, 2020, Plaintiffs filed a Second Amended Complaint, removing LASD as a Defendant.  (*See* Second Am. Compl., ECF No. 18.)  Accordingly, in this Order, the Court uses the term "Defendants" to refer only to the remaining named Defendants.

1   "Motion"), ECF No. 55.)  As explained below, the Court **GRANTS** in **PART** and

2   **DENIES** in **PART** Defendants' Motion.[2]

3                    **II.      BACKGROUND**

4          The following facts are undisputed unless otherwise noted.  On December 16,

5   2019, Perez and non-party Deputy Kevin Thompson (together, the "Deputies") were

6   driving in their patrol car in East Los Angeles when they noticed a man walking south

7   on Rowan Avenue.  (Defs.' Statement Uncontroverted Facts ("DSUF") 1, 3, ECF

8   No. 55-2.)  Perez and Thompson identified the man as Serrano,[3] a known gang

9   member who had prior contact with law enforcement, including several prior arrests

10  and multiple felony convictions.  (DSUF 5.)  The Deputies knew Serrano had violated

11  his parole and had a "no-bail" warrant for his arrest.  (DSUF 7.)

12         The parties agree that Thompson exited the vehicle to detain Serrano.

13  (DSUF 9.)  However, neither party seems to assert a consistent rendition of the facts

14  that transpired next.  According to Defendants, when the Deputies stopped their car,

15  they engaged in a "consensual encounter" with Serrano.  (DSUF 4.)  However,

16  Defendants also contend that when they stopped the car, Serrano pulled out a gun

17  from his waistband and began running.  (DSUF 9.)  The Court notes that it is highly

18  unlikely that Serrano both consented to the Deputies' stop and simultaneously

19  revealed his gun and ran away.

20         Plaintiffs' rendition of the facts is neither clearer nor more consistent.

21  According to Plaintiffs, Serrano never consented to the stop because he began running

22  away from the Deputies "as soon [as] the vehicle stop[ped]" or as soon as he saw the

23  patrol vehicle.  (PSGD 5, 6.)  Yet somehow, Plaintiffs also "[d]ispute[] that Jorge

24

25  [2] Having carefully considered the papers filed in connection with the Motion, the Court deemed the
    matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

26  [3] In one part of their Statement of Genuine Disputes, Plaintiffs do not dispute that the officers
    recognized the man as Serrano, (Pls.' Statement of Genuine Disputes ("PSGD") 5, ECF No. 64-1);

27  however, in another part of their Statement, they blatantly contradict this by "disput[ing] that the
    deputies recognized Jorge Serrano," (PSGD 6).  Despite Plaintiffs' apparent concession that the

28  Deputies recognized Serrano, the Court views this fact as disputed.

2

Serrano began running away from the Deputies as soon as he saw the Deputies."
(PSGD 9.)   Thus, neither party has relayed a clear or consistent version of what
happened in this moment.

The parties agree that, upon seeing Serrano's gun, Thompson yelled "417" and
"gun" to warn Perez.  (DSUF 10.)  According to Defendants, as Serrano was running
away, he turned his upper body back towards the Deputies and pointed his firearm
toward the Deputies.  (DSUF 12.)  Plaintiffs state that Serrano was only running away
and never pointed his gun at the Deputies.  (PSGD 12.)  Thompson then directed
Serrano to stop and drop the gun but, according to Defendants, Serrano kept his hands
on the gun.  (DSUF 13–14; *but see* PSGD 14.)  Defendants contend that Thompson
feared for his and Perez's lives when he fired a single shot at Serrano (the "First
Shot"), which struck Serrano.  (DSUF 15; PSGD 19.)  However, Plaintiffs argue that
forensic evidence demonstrates that the First Shot likely came from Perez.
(PSGD 15.)

Although Serrano "yelped," he continued running and a foot pursuit ensued.
(DSUF 16–17.)   According to Defendants, "[a]s the pursuit continued, Serrano's
behavior became increasingly erratic," a characterization that Plaintiffs dispute.
(DSUF 19; PSGD 19.)   Defendants assert that "[t]he deputies repeatedly directed
Serrano to stop and drop the gun, but he disregarded their commands and continued
running with the gun in his hand"; Plaintiffs contend that Serrano did not have a gun
in his hands.  (DSUF 20; PSGD 20.)  After approximately one quarter of a mile,
Serrano stopped running and the Deputies stopped approximately "a car length"
behind him.  (DSUF 22–23.)  Defendants contend that, at that time, Serrano had his
back to the Deputies but they "could see that he was manipulating something in his
hands."  (DSUF 24.)  The Deputies directed Serrano to turn around with his hands
visible.  (DSUF 25.)  According to Defendants, Serrano turned around but instead of
dropping the gun, he assumed a shooting stance and aimed it at the Deputies.
(DSUF 26.)   Plaintiffs dispute that Serrano had a gun in his hands or assumed a

shooting stance.  (PSGD 26.)  Defendants assert that witnesses heard the Deputies instructing Serrano to "get down" and Serrano replied, "no"; however, Plaintiffs dispute these witness accounts.  (DSUF 27; PSGD 27.)

The Deputies then fired at Serrano: Thompson fired two rounds (the "Second and Third Shots") and Perez fired four rounds (the "Fourth through Seventh Shots").[4] (DSUF 28–29.)  Serrano fell onto his back with his hands above his head.  (DSUF 30.) According to Defendants, Thompson saw that Serrano still had the gun in his hand and was trying to aim the gun at Thompson; Plaintiffs maintain that Serrano did not have a gun in his hands. (DSUF 33; PSGD 33.)  Thompson then fired two final rounds at Serrano (the "Eighth and Ninth Shots").  (DSUF 34.)  Defendants contend that at that point, Serrano dropped the gun and tried to crawl away before falling still. (DSUF 35.)

Several other deputies arrived at the scene and helped Thompson detain Serrano.  (DSUF 36–37.)  Thompson and another deputy then began performing CPR on Serrano until fire department personnel arrived and pronounced Serrano dead. (DSUF 38–39.)  Detectives from LASD's Homicide Bureau later investigated the incident.  (DSUF 40.)  Serrano's parents, Plaintiffs, brought this action individually and as successors in interest to Serrano.

In the operative Third Amended Complaint, Plaintiffs assert nine claims against Defendants, the first six pursuant to 42 U.S.C. § 1983 and the remaining three under California law: (1) excessive force and denial of medical care (against Perez and the County); (2) substantive due process (against Perez); (3) supervisory liability (against Villanueva);    (4)–(6) municipal    liability    (against    the    County);    (7) battery; (8) negligence; and (9) violation of the Bane Act, California Civil Code section 52.1

---

[4] The Court does not know the exact order in which the Second through Seventh Shots were fired and understands only that all six of these shots were fired within milliseconds of each other, or otherwise simultaneously.  The Court employs the aforementioned naming mechanism only to indicate which deputy fired the shots and not to indicate the chronological order of the shots (e.g., the "Second Shot" is not necessarily the actual second shot that was fired).

1  (claims (7)–(9) against Perez and the County).  (Third Am. Compl. ("Compl."), ECF

2  No. 23.)  Defendants now move for summary judgment on all nine claims.  (*See* Mot.)

3  The Motion is fully briefed.  (*See* Opp'n, ECF No. 64; Reply, ECF No. 66.)

4  ### III.    LEGAL STANDARD

5  A court "shall grant summary judgment if the movant shows that there is no

6  genuine dispute as to any material fact and the movant is entitled to judgment as a

7  matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a

8  genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*,

9  477 U.S. 317, 322–23 (1986), and the court must view the facts and draw reasonable

10  inferences in the light most favorable to the nonmoving party, *Scott v. Harris*,

11  550 U.S. 372, 378 (2007); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.

12  2000).  A disputed fact is "material" where the resolution of that fact might affect the

13  outcome of the suit under the governing law, and the dispute is "genuine" where "the

14  evidence is such that a reasonable jury could return a verdict for the nonmoving

15  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although the

16  Court may not weigh conflicting evidence or make credibility determinations, there

17  must be more than a mere scintilla of contradictory evidence to survive summary

18  judgment.  *Addisu*, 198 F.3d at 1134.

19  Once the moving party satisfies its initial burden, the nonmoving party cannot

20  simply rest on the pleadings or argue that any disagreement or "metaphysical doubt"

21  about a material issue of fact precludes summary judgment.  *See Celotex*, 477 U.S.

22  at 322–23; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

23  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466,

24  1468 (9th Cir. 1987).  A "non-moving party must show that there are 'genuine factual

25  issues that properly can be resolved only by a finder of fact because they may

26  reasonably be resolved in favor of either party.'"  *Cal. Architectural Bldg. Prods.*,

27  818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250).  Conclusory or speculative

28  testimony in affidavits is insufficient to raise genuine issues of fact and defeat

summary judgment, as is "uncorroborated and self-serving" testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Courts should grant summary judgment against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

## IV.    **PRELIMINARY MATTERS**

The Court addresses the parties' various evidentiary objections and requests for judicial notice as follows.

### A.    **Evidentiary Objections**

The parties raise numerous objections to evidence presented in the various filings.  (*See* Pls.' Evid. Objs., ECF No. 64-6; Defs.' Evid. Objs. Opp'n, ECF No. 66-1; Defs.' Resp. PSGD, ECF No. 66-2.)  Evidentiary objections in motions for summary judgment are typically unnecessary and not useful.  This is because, "[r]egardless of whether a party objects, the Court . . . will always recognize plain error."  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (first citing Fed. R. Evid. 103(d); and then citing *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 357 (9th Cir. 1996)).  "Nevertheless, attorneys routinely raise every objection imaginable without regard to whether the objections are necessary, or even useful, given the nature of summary judgment motions in general, and the facts of their cases in particular."  *Id.*  Evidentiary objections based "on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself."  *Id.*  "Instead of *objecting*, parties should simply *argue* that the facts are not material."  *Id.* Accordingly, the Court **OVERRULES** all such objections.

Additionally, the Court **OVERRULES** all boilerplate objections and improper argument in the parties' objections.  (*See* Scheduling & Case Mgmt. Order 7–9, ECF No. 17.)  When the objected evidence is unnecessary to the resolution of the summary

judgment motion or supports facts not in dispute, the Court need not resolve those objections. To the extent the Court relies on objected evidence without discussion in this Order, the Court **OVERRULES** the objections. *See Burch*, 433 F. Supp. 2d at 1122 (proceeding with only necessary rulings on evidentiary objections).

Plaintiffs also filed a general objection to Defendants' Motion, arguing that Defendants submitted evidence and exhibits in support of their Motion, "which have absolutely no bearing nor relate to any of the issues at hand." (Pls.' Objs. Mot., ECF No. 63.) Accordingly, Plaintiffs ask the Court to strike Defendants' Motion in its entirety. (*Id.*) For the reasons stated above, the Court **OVERRULES** the general objection and **DENIES** this request to strike.

**B.     Requests for Judicial Notice**

Additionally, both parties filed requests for judicial notice. Defendants request that the Court take judicial notice of Plaintiffs' previous motion to add Thompson as a Defendant in this action and Plaintiffs' complaint against Thompson in a separate, related action. (*See* Defs.' Req. Judicial Notice ("DRJN"), ECF No. 55-3.) The Court does not rely on either of these documents to resolve Defendants' instant Motion and therefore **DENIES** as **MOOT** the DRJN.

Finally, Plaintiffs request that the Court take judicial notice of two documents: (1) Judge Phillip Gutierrez's January 5, 2020 Order Denying in Part Defendants' Motion for Summary Judgment in *Lisa Vargas v. County of Los Angeles, et al.* (Case No. 2:19-cv-03279-PSG (ASx)), (Pls.' Req Judicial Notice ("PRJN"), Ex. 18 ("*Vargas* Order"), ECF No. 64-5); and (2) the Office of the Inspector General, County of Los Angeles, Analysis of the Criminal Investigation of Alleged Assault by Banditos, October 2020, (PRJN, Ex. 19 ("Banditos Analysis")).

The Court may take judicial notice of court filings and other undisputed matters of public record. *See* Fed. R. Evid. 201(b); *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007). As both the *Vargas* Order and the Banditos Analysis constitute undisputed matters of public record, the Court **GRANTS** the PRJN, judicially

noticing the existence of these documents but not any disputed matters contained therein.

## V.    DISCUSSION

Defendants move for summary judgment on all nine of Plaintiffs' claims.  (*See* Mot.)   Plaintiffs assert that genuine disputes of material fact preclude summary judgment for Defendants on each claim.  (*See* Opp'n.)   The Court addresses each claim in turn.

### A.    First Claim: Excessive Force & Denial of Medical Care

Plaintiffs assert an excessive force and denial of medical care claim pursuant to 42 U.S.C. § 1983 against Perez and the County, based on Perez's use of deadly force against Serrano when firing the Fourth through Seventh Shots.   (*See* Compl.) Defendants contend they are entitled to summary judgment on Plaintiffs' excessive force claim because the uncontroverted evidence shows Perez's use of deadly force did not constitute a constitutional violation under the circumstances.  (Mot. 15–20.) Thus, Defendants argue that the force used was objectively reasonable, thereby entitling Defendants to qualified immunity.  (*Id.*)  Defendants also argue that even if a jury could find the Deputies' use of force was not objectively reasonable and, therefore, was a constitutional violation, they are nevertheless entitled to qualified immunity because there was no clearly established fact-specific precedent at the time of the incident putting them on notice that their conduct violated constitutional rights. (*Id.*).  Finally, Defendants argue that  Plaintiffs' first claim also fails because Perez was not involved with, and therefore cannot be responsible for, Serrano's medical care.

"The Supreme Court has explained that '[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).   In determining whether qualified immunity applies, the

Ninth Circuit first determines "whether the officers actually violated a constitutional right based on the record and plaintiffs' alleged facts." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020).  If the court finds that "no constitutional right was violated, then no further analysis is required."  *Id.*  However, if the court finds "that the officers *did* violate a constitutional right [it would] then need to proceed to the second step of the inquiry to decide if the constitutional right 'was clearly established at the time of [the officers'] alleged misconduct.'"  *Id.* (second alteration in original) (quoting *Pearson*, 555 U.S. at 232).

       1.   *Constitutional Violation*

"Because apprehending a suspect through the use of deadly force is considered a Fourth Amendment seizure of the person, [courts] must determine if the officers acted in an objectively reasonable manner when they [used] deadly force or if they violated [the suspect's] right to be free from unreasonable seizures." *Id.* at 1157.

Applying the holdings of *Graham v. Connor*, 490 U.S. 386 (1989), the Ninth Circuit analyzes reasonableness by "considering the nature and quality of the alleged intrusion" and "the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight" (the "*Graham* factors").  *Mattos*, 661 F.3d at 441 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)); *see Graham*, 490 U.S. at 396.  "[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh their way through the factbound morass of 'reasonableness.'"  *Mattos*, 661 F.3d at 441 (alteration and internal quotation marks omitted) (quoting *Scott*, 550 U.S. at 383).

The reasonableness of the force used is "judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.  An officer cannot simply claim that he "fear[ed] for his safety or the safety of others . . . there must be objective factors to justify such a concern." *Young v. County of Los Angeles*, 655 F.3d 1156,

1163 (9th Cir. 2011).   Notably, the fact that the suspect was armed—or even reasonably believed to be armed—with a deadly weapon does not render the officers' response per se reasonable under the Fourth Amendment.   *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

In light of the above, "[w]here the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by a jury'; only in the absence of material disputes is it 'a pure question of law.'" *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (first quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003); and then quoting *Scott*, 550 U.S. at 381 n.8).   As such, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* at 1125.

The Court finds that the first and third *Graham* factors weigh at least slightly in favor of Perez's objective reasonableness because Serrano was actively fleeing from the Deputies with a gun.   However, genuine disputes of material fact as to the second *Graham* factor preclude summary judgment on the excessive force claim. Specifically, there are genuine factual disputes as to whether Serrano posed an immediate threat of harm to the Deputies or others, which is the most significant factor.   *See Mattos*, 661 F.3d at 441; *see also Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (finding whether plaintiff posed a threat to be the most important of the *Graham* factors), *cert. denied*, 545 U.S. 1128 (2005).   The Court addresses each *Graham* factor in order, focusing on the force used by Perez—that is, the Fourth through Seventh Shots—because the First through Third, Eighth, and Ninth Shots were fired by Thompson, who is not a party to this action.

      *a.   Whether the Crime was Severe*

In this case, the parties agree that there was no report of an ongoing crime when the Deputies stopped Serrano.   (PSGD 70.)   However, the parties also agree that Serrano had a "no-bail" warrant out for his arrest when the Deputies stopped him. (DSUF 7.)   The parties also do not dispute the following: at some point, the Deputies

1  identified Serrano as the subject of the arrest warrant with previous arrests and felony
2  convictions; the Deputies saw that Serrano had a gun; and Serrano ran from the
3  Deputies—all before any deadly force was used.  (DSUF 5, 9, 10, 12; PSGD 5, 6, 9,
4  12.)

5        Although the mere existence of an arrest warrant is not a strong justification for
6  the use of dangerous or deadly force, such a warrant combined with the fact the
7  suspect is fleeing the officers may provide stronger justification.  *See Chew v. Gates*,
8  27 F.3d 1432, 1442–43 (9th Cir. 1994) (noting that three warrants was not strong
9  justification for the use of dangerous force when suspect was not fleeing the officers
10 because the prospects for imminent capture were far greater).  Moreover, "[t]he
11 government has an undeniable legitimate interest in apprehending criminal
12 suspects . . . and that interest is even stronger when the criminal is . . . suspected of a
13 felony.  This factor strongly favors the government."  *Miller v. Clark County*,
14 340 F.3d 959, 964 (9th Cir. 2003) (internal citation omitted).  Thus, the Deputies'
15 knowledge of Serrano's arrest warrant and felonious criminal history, combined with
16 the fact that Serrano was fleeing with a gun, weigh slightly in favor of Perez's
17 objective reasonableness when using deadly force.

18             b.  *Whether Serrano Posed an Immediate Threat*

19       The most important *Graham* factor is whether Serrano posed an immediate
20 threat to the Deputies or to others.  Defendants argue that Serrano posed an immediate
21 threat when Perez fired the Fourth through Seventh Shots because Serrano's behavior
22 became "increasingly erratic" as the foot pursuit continued and Serrano refused to
23 comply with multiple commands to stop running and drop his weapon.  (DSUF 19–
24 24.)  Defendants assert that when Serrano finally stopped running, he refused to show
25 his empty hands and instead kept his back to the Deputies and appeared to be
26 "manipulating something in his hands."  (*Id.*)  Most significantly, Defendants argue
27 that Serrano then turned around, assumed a shooting stance, and aimed his gun at the
28 Deputies.  (DSUF 26.)

In support of these contentions, Defendants cite to the deposition and declaration testimonies of the Deputies, Detective Gordon Lukehart[5] (who later investigated the incident), and Lukehart's interview of third party witness, Jordan Juarez. (*See* Decl. Nikolis Perez ("Perez Decl."), ECF No. 57; Decl. Kevin Thompson ("Thompson Decl."), ECF No. 58; Decl. Gordon Lukehart ("Lukehart Decl."), ECF No. 59; Decl. Mira Hashmall ("Hashmall Decl.") ¶ 28, Ex. Z ("Juarez Interview"), ECF No. 61.)   Defendants also rely on surveillance video footage from nearby residences to substantiate their rendition of the facts.  (*See* Lukehart Decl. ¶¶ 14, 15, 24 Exs. D, E, F, L, ECF Nos. 59-4 to 59-6, 59-12 (collectively, "Defendants' Footage").)

However, Plaintiffs dispute Defendants' contentions and support their version of events with equivalent evidence.  According to Plaintiffs, Serrano did not have a gun in his hands during the foot pursuit and was "was simply running away from the deputies." (PSGD 12–14, 20, 24, 26, 33.)  Plaintiffs state that Serrano never assumed any shooting stance and never aimed his gun at the Deputies.   (PSGD 79.)  Accordingly, Plaintiffs conclude, that Serrano was merely running away from the Deputies with no weapon in his hands and therefore posed no immediate threat to the Deputies or others.  Notably, Plaintiffs argue that at the time Perez and Thompson fired the Second through Seventh Shots, Serrano had stopped running, was surrendering to the Deputies, and had his visibly empty hands in the air.  (PSGD 105–15.)  Plaintiffs support their arguments with the deposition testimonies of numerous third-party witnesses and surveillance video footage similar to that submitted by Defendants.  (*See* Decl. Christian Contreras ("Contreras Decl.") ¶¶ 2, 3, 5, 7, Exs. 1, 2, 4, 6, ECF No. 64-2 (collectively, "Plaintiffs' Footage").)   In view of Plaintiffs'

---

[5] Plaintiffs focus the majority of their objections on Defendants' alleged use of Lukehart as "a non-retained expert" and further object to Lukehart's testimony as hearsay.  (*See* Pls.' Evid. Objs. 2.) The Court notes that it relies on Lukehart's testimony only to authenticate Defendants' Footage, which Plaintiffs do not seem to dispute.  Accordingly, the Court need not and does not rule on these objections.

1   contrary narration of facts, all supported by evidence, there are genuine disputes of
2   fact as to whether Serrano posed an immediate threat, which the Court must view in
3   the light most favorable to Plaintiffs unless video evidence plainly clarifies events.

4          Although both parties provide different cuts of what is essentially the same
5   video surveillance footage to substantiate their narrations of the facts, none of the
6   footage is sufficiently clear or comprehensive so as to blatantly contradicts either
7   version of the events.  That is, the video footage depicts Serrano running away from
8   the Deputies as they chase him but is not clear enough to show whether Serrano had a
9   gun in his hands or whether his hands were empty.  Notably, even if the video footage
10  did clearly show Serrano's hands, the footage shows only broken segments of the foot
11  pursuit, each a few seconds long, and thus is not comprehensive enough to concretely
12  indicate whether, at some time during the pursuit, Serrano pulled out a gun and aimed
13  it at the Deputies, put the gun away (e.g., back into his waistband), assumed a
14  shooting stance, pointed the gun at anyone, or surrendered to the Deputies.  Thus, the
15  video footage does not clearly contradict either party's narration of the facts and
16  therefore cannot answer the factual question of whether Serrano posed an immediate
17  threat.  *See A.G., 1-4 v. City of Fresno*, 804 F. App'x 701, 702 (9th Cir. 2020) (citing
18  *Scott*, 550 U.S. at 381) (finding the court may "view[] the facts in the light depicted by
19  the video[]" to the extent that it "blatantly contradict[s]" one party's version of the
20  incident).

21         Accordingly, viewing these factual disputes in the light most favorable to
22  Plaintiffs—that Serrano did not have a weapon in his hands, never pointed a weapon
23  at anyone or assumed any shooting stance, was merely running away from the
24  Deputies, and eventually surrendered to the Deputies with his visibly empty hands in
25  the air—a reasonable jury could conclude that Perez's Fourth through Seventh Shots
26  were not objectively reasonable.  Thus, this factor cannot be resolved on summary
27  judgment.

28

1          *c.  Whether Serrano Was Attempting to Resist or Evade Arrest*

2          Although Plaintiffs attempt to argue that Serrano was not attempting to evade

3    arrest, (*see* Opp'n 1–2), the overwhelming evidence, including that provided by

4    Plaintiffs, contradicts this contention as to the Second through Seventh Shots.  The

5    surveillance video footage provided by both Defendants *and* Plaintiffs clearly depicts

6    Serrano running away from the Deputies as they chased him.  And in their Statement

7    of Genuine Disputes, Plaintiffs make numerous concessions that Serrano was indeed

8    running away from the Deputies, even after being hit by the First Shot, and at least

9    until immediately before Perez fired the Fourth through Seventh Shots.  (*See e.g.*,

10   PSGD 11 ("Jorge Serrano ran away from the deputies."); PSGD 12 ("Jorge Serrano

11   was simply running away from the deputies."); PSGD 14, 16, 17, 19.)  Thus, there is

12   no genuine dispute that Serrano was actively fleeing the Deputies and evading arrest,

13   at least just before Perez fired the Fourth through Seventh Shots.  Even if Plaintiffs'

14   contention that Serrano stopped running to surrender is true, the undisputed facts

15   demonstrate that Serrano was actively evading arrest in the moments leading up to

16   Perez's Fourth through Seventh Shots.  Accordingly, this factor weighs in favor of the

17   objective reasonableness of Perez's Second through Seventh Shots.

18         *2.    Clearly Established, Fact-Specific Precedent*

19         The Court next considers the second step of the qualified immunity analysis:

20   whether clearly established fact-specific precedent existed that rendered Perez's use of

21   deadly force against Serrano unconstitutional.   Thus, the Court must determine

22   whether the officers' conduct "violate[d] clearly established statutory or constitutional

23   rights of which a reasonable person would have known."  *Bryan v. MacPherson*, 630

24   F.3d 805, 832 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

25   (1982)).

26         As discussed above, the Court finds that there are genuine disputes of material

27   fact as to the circumstances surrounding Perez's use of deadly force against Serrano.

28   Thus, the Court views all disputed facts in the light most favorable to Plaintiffs, the

non-movants.  Under this recitation of the facts, Serrano never had a gun in his hands, never aimed a gun at anyone, merely ran away from the Deputies, and eventually surrendered to them with his visibly empty hands in the air.  At the time of the shooting, clearly established precedent held that deadly force under these circumstances was unconstitutional.  *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (concluding deadly force is permissible only when "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm"); *George*, 736 F.3d at 838 (rendering deadly force against a suspect as unconstitutional, despite the suspect having a pistol in his hand, because the suspect's pistol was pointed down and therefore was not a threat to the officers).

In summary, a genuine dispute of material fact exists regarding whether Serrano posed an immediate threat to the Deputies or others, which precludes the Court from finding the Perez's force against Serrano was not a constitutional violation.  *See Smith*, 394 F.3d at 701 ("Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  (alteration in original)).  Additionally, Defendants fail to show Perez is entitled to qualified immunity based on a lack of fact-specific precedent rendering his deadly force unconstitutional.  Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' excessive force claim.

### 3.    *Denial of Medical Care*

In addition to allege excessive force in their first claim, Plaintiffs also assert constitutional violations resulting from Perez's alleged denial of Serrano's medical care.  Defendants finally argue that they are entitled to summary judgment on Plaintiffs' first claim because Perez was not involved with Serrano's medical care. (Mot. 22.)  Plaintiffs do not address this argument.  (*See generally* Opp'n.)  Indeed, "[l]iability under § 1983 must be based on the personal involvement of the defendant."

1    *Payne v. Butler*, 713 F. App'x 622, 623 (9th Cir. 2018) (quoting *Barren v.*
2    *Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)); *see e.g.*, *Grandinetti v. Bauman*,
3    No. CIV 07-00089 ACK/LEK, 2007 WL 676012, at *3 (D. Haw. Feb. 28, 2007)
4    (dismissing claims for denial of medical care because the plaintiff did not allege any
5    direct or personal involvement by the defendants or claim that they participated in or
6    directed the denial of medical care).

7         Here, the parties agree the Thompson and another unidentified deputy
8    performed CPR on Serrano after he was detained, but neither party suggests any other
9    Deputies—namely, Perez—provided any medical care to Serrano.  Thus, looking to
10   the undisputed material facts, the Court finds that Defendants are entitled to judgment
11   as a matter of law regarding the denial of medical care theory of Plaintiffs' first claim.
12   Accordingly, the Court **GRANTS** Defendants' Motion for summary judgment as to
13   Plaintiffs' first claim on the theory of denial of medical care.

14        **B.    Second Claim: Substantive Due Process**

15        Plaintiffs also assert a claim for violation of Serrano's substantive due process
16   rights resulting from Perez's deadly force and violation of Plaintiffs' substantive due
17   process rights resulting from state interference with their familial relationship with
18   their son.  Defendants seek summary judgment on Plaintiffs' second claim under
19   42 U.S.C. § 1983, asserted against Perez for violation of Serrano's and Plaintiffs'
20   substantive due process under the Fourteenth Amendment.  (Mot. 20–22.)

21        "To prevail on a substantive due process claim under the Fourteenth
22   Amendment, Plaintiffs must show that an officer's conduct 'shocks the conscience.'"
23   *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019) (quoting
24   *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  "The 'critical consideration
25   [is] whether the circumstances are such that actual deliberation is practical.'"  *Id.*
26   (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  "If so, an officer's
27   deliberate indifference may suffice to shock the conscience and the plaintiff may
28   prevail by showing that the officer disregarded a known or obvious consequence of

his action." *Id.* at 692–93 (internal citations and quotation marks omitted). "The 'deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state.'" *Id.* at 693 (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)).

Here, Defendants argue that Perez is entitled to qualified immunity for this claim because Plaintiffs cannot show that Perez acted with the requisite intent. (Mot. 20–22.)   Although Defendants suggest that Perez could not have acted with such deliberateness because he had to "make a snap judgment because of an escalating situation," (Mot. 21), according to Defendants, Perez was chasing Serrano for several minutes and knew Serrano had a gun in his hands all along.   Thus, even if the Court looks to Defendants' narration of the facts, the circumstances would be such that "actual deliberation" by Perez would have been practical. *Nicholson*, 935 F.3d at 692. Further, resolving all factual disputes in favor of Plaintiffs as the non-movants, Perez fired his gun four times at a suspect who had no weapon in his hands, posed no immediate threat to anyone, and was surrendering with his visibly empty hands in the air.   Based on these facts, a reasonable jury could find that Perez acted with such deliberate indifference so as to "shock the conscious" because he "disregarded a known or obvious consequence of his action." *Id.* at 692–93.   Accordingly, the Court **DENIES** Defendants' Motion as to Plaintiffs' substantive due process claim.

### C.   Third Claim: Supervisory Liability

Defendants move for summary judgment on Plaintiffs' third claim, asserted against Villanueva, for supervisory liability for Perez's constitutional violations. (Mot. 33–34.) "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks and citation omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control

of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)). The Ninth Circuit has "never required a plaintiff to allege that a supervisor was physically present when the injury occurred." *Id.* at 1205.

Here, Defendants argue that Plaintiffs' supervisory liability claim fails because they cannot show a predicate constitutional violation, Villanueva's personal involvement with such violation, or a "causal connection" between Villanueva's conduct and the violation. (Mot. 33–34.) As explained above, Plaintiffs have provided evidence to support their contention that a constitutional violation occurred when Perez used deadly force against Serrano. However, Plaintiffs do not provide any facts supported by evidence to demonstrate what, specifically, Villanueva did to cause Perez to use deadly force against Serrano.[6] Even if these facts were true, no reasonable jury could find that Villanueva was personally involved in, and caused, Perez's deadly force against Serrano. Accordingly, the Court **GRANTS** Defendants' Motion as to this claim.

### D.    Fourth Through Sixth Claims: Municipal Liability (*Monell*)

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert municipal liability claims for (i) ratification, (ii) unconstitutional custom, policy, or practice, and (iii) failure to train. (Compl. ¶¶ 66–158.) Defendants seek summary judgment on all three claims, arguing that Plaintiffs lack supporting evidence for each. (Mot. 25–33.) As explained below, the Court finds that a reasonable jury could find Plaintiffs' evidence sufficient to establish their *Monell* claims.

---

[6] In support of their third claim, Plaintiffs only provide facts and evidence to suggest that Villanueva knew of the "Banditos" gang problem and that Villanueva "turned over the entire leadership of the East Los Angeles Station in order to address the Banditos problem." (PSGD 168, 172–73.) However, Plaintiffs fail to connect this tangential and vague fact about the Banditos gang problem to Villanueva's responsibility for Perez shooting Serrano.

1        *1.    Predicate Constitutional Violation*

2           Defendants first argue that they are entitled to summary judgment on Plaintiffs'

3    municipal liability claims because there is no evidence of any constitutional violation,

4    as required under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

5    (Mot. 26–27.)  As discussed above, the Court finds there is a genuine dispute of

6    material fact as to whether Perez's use of force was a constitutional violation.  Thus,

7    the Court rejects this argument.   Additionally, Defendants contend that Plaintiffs

8    cannot show a predicate constitutional violation by Thompson that would support

9    municipal liability for Thompson's conduct.  The Court again disagrees.

10          The Court's above *Graham* factor analysis as to Perez's Fourth through Seventh

11   Shots applies almost identically to Thompson's First through Third, Eighth and Ninth

12   Shots.  Thompson's First through Third Shots were just as objectively reasonable as

13   Perez's Fourth through Seventh Shots because they were all fired under similar

14   circumstances.  The only difference arises as to the Eighth and Ninth Shots, which

15   Thompson fired when Serrano had already been shot numerous times and fallen to the

16   ground on his back.  Viewing the disputed facts in the light most favorable to

17   Plaintiffs, when Thompson fired his Eighth and Ninth Shots, Serrano posed a minimal

18   risk of evading arrest, and, more importantly, of causing immediate harm to anyone—

19   rendering these shots even *less* objectively reasonable than the others.  In summary,

20   for the same reasons a reasonable jury could find Perez committed a constitutional

21   violation when firing his Fourth through Seventh Shots, a reasonable jury could find

22   Thompson committed a constitutional violation when firing his First through Third

23   Shots and Eighth and Ninth Shots.

24       *2.    Fourth Claim: Ratification or Authorization*

25          Defendants next seek summary judgment on Plaintiffs' fourth claim, arguing

26   that Plaintiffs have no evidence of the City ratifying or authorizing an unconstitutional

27   policy or custom, as required by *Monell*.  (Mot. 28–30.)  Municipalities "may be held

28   liable under § 1983 when the individual who committed the constitutional tort was an

official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (internal quotation marks omitted). The Ninth Circuit set forth four requirements that a plaintiff must show for a § 1983 municipal liability claim: "(1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *McDougal v. County of Orange*, No. 21-cv-2027-JVS (ADS), 2022 WL 2374874, at *2 (C.D. Cal. June 30, 2022) (quoting *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). "Ratification is generally a question of fact for the jury, and by implication, so too is deliberate indifference." *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1099 (N.D. Cal. 2005) (internal citation omitted).

Here, Plaintiffs allege Perez was a prospect of the Banditos gang in the LASD and that Perez used unconstitutional deadly force toward Perez and at least one other person in order to secure his membership in the gang. (Compl. ¶¶ 25, 35, 36.) Accordingly, Plaintiffs allege, the LASD by way of the Banditos ratified such unconstitutional actions. (Compl. ¶¶ 66–77.) In support of their allegations, Plaintiffs cite to the *Vargas* Order, which is derived from an excessive force civil action also against Perez, to demonstrate that Perez has engaged in similar tortious conduct before and was not reprimanded—and instead was rewarded—for it. (PSGD 158–60.) And although Defendants argue that a "single failure to discipline" cannot be the basis for *Monell* liability, (Mot. 29), the *Vargas* Order suggests that tortious conduct was and is proliferate in the LASD. (*See Vargas* Order 17–18 (noting that "Plaintiff has provided ample evidence of the existence of the Banditos gang and the [LASD's] deliberate indifference to its practices," which include destroying evidence and fabricating probable cause).) Plaintiffs also provide the Banditos Analysis, which further

evidences the existence of the Banditos gang and the County's ratification, by way of the LASD's deliberate indifference, toward the repeated tortious conduct of its deputies including Perez. (*See generally* Banditos Analysis.) Thus, a reasonable jury could consider Plaintiffs' evidence and conclude that the County has a practice of ratifying tortious conduct.

### 3.    Fifth Claim: Unconstitutional Custom or Policy

Defendants next seek summary judgment on Plaintiffs' sixth claim for *Monell* liability on the basis that Plaintiffs have no evidence of an unconstitutional custom or policy. (Mot. 30–32.) In *Monell*, the Supreme Court held that municipalities may be held liable under § 1983 only for constitutional violations resulting from official county custom or policy. 436 U.S. at 694. "The custom or policy must be a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (alteration in original; internal quotation marks omitted). The policies can include "written policies, unwritten customs and practices, [and] failure to train municipal employees on avoiding certain obvious constitutional violations." *Id.*

Here, Plaintiffs again cite to the *Vargas* Order and the Banditos Analysis as evidence supporting their claim that the County has an unconstitutional custom or policy. Notably, Plaintiffs also provide extensive testimony by their retained expert, Roger Clark, who provides substantial testimony regarding the existence of the County's unconstitutional customs and policies of deliberately disregarding, not investigating, and actively concealing violative conduct. (PSGD 144–52.) A reasonable jury could consider this evidence and conclude it supports the existence of an unconstitutional policy or custom, sufficient to establish *Monell* liability. Thus, the Court denies Defendants' Motion as to this claim.

1

*4.    Sixth Claim: Failure to Train*

2       Finally, Defendants seek summary judgment on Plaintiffs' sixth claim on the

3   basis that Plaintiffs have no evidence of a failure to train the officers.  (Mot. 32–33.)

4   "[T]he inadequacy of police training may serve as the basis for § 1983 liability only

5   where the failure to train amounts to deliberate indifference to the rights of persons

6   with whom the police come into contact."  *Flores v. County of Los Angeles*, 758 F.3d

7   1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388

8   (1989).)   Here, Plaintiffs cite to the undisputed fact that Perez was Thompson's

9   training officer.  (DSUF 2.)  Relying on Clark's expert opinion, Plaintiffs argue that

10  Perez was responsible for training Thompson, failed to do so, and instead, instructed

11  Thompson to shoot and kill Serrano—conduct that is contrary to the LASD's training

12  policies.  (PSGD 147, 149, 151.)  If Plaintiffs' facts are taken as true, Perez's violative

13  instructions and failure to adequately train Thompson certainly amount to a deliberate

14  indifference  toward  Serrano's  constitutional  rights.    Plaintiffs  therefore  provide

15  evidence to support their failure to train municipal liability claim.

16      Plaintiffs  have  offered  evidence  sufficient  for  a  reasonable  jury  to  find  for

17  Plaintiffs on each municipal liability claim.  The Court thus **DENIES** Defendants'

18  Motion for summary judgment on Plaintiffs' fourth, fifth, and sixth claims.

19  **E.    Seventh Through Ninth Claims Under State Law**

20      Defendants finally move for summary judgment on Plaintiffs' state law claims

21  for battery (seventh claim), negligence (eighth claim), and violation of the Bane Act

22  (ninth claim).  (Mot. 22–25.)  As explained below, genuine disputes of material fact

23  preclude summary judgment on each of these claims.

24  *1.    Battery & Negligence (Wrongful Death)*

25      Defendants seek summary judgment on Plaintiffs' wrongful death claims based

26  in battery and negligence, arguing that these claims fail because Perez did not cause

27  Serrano's death.  (Mot. 22–23.)  In support of this contention, Defendants point to the

28  undisputed  fact  that  *Thompson*  fired  the  final  two  shots  before  Serrano  was

pronounced dead.  (*Id.*; *see* PSGD 63.)  However, this alone fails to establish that either of Thompson's final two shots were fatal.  Absent evidence establishing that Thompson's shots killed Serrano, not Perez's, Defendants have failed to meet their burden on summary judgment.  *See Celotex*, 477 U.S. 322–23.

Defendants alternatively argue that they are entitled to summary judgment on Plaintiffs' battery and negligence claims because Plaintiffs cannot show that Perez used unreasonable force, as is required for these claims.  (Mot. 23–25.)  Viewing the disputed facts in a light favorable to Plaintiffs, a reasonable jury could conclude the force Perez used was objectively unreasonable.  Thus, the Court **DENIES** summary judgment as to Plaintiffs' battery and negligence claims on this basis.

     *2.*    *Bane Act*

Defendants also seek summary judgment on Plaintiffs' Bane Act claim, arguing that it necessarily fails along with Plaintiffs' § 1983 claims.  (Mot. 24.)  A Bane Act claim is premised on the violation of a federal constitutional right, and as such, a court must look to the elements of the constitutional claim to determine whether a Bane Act claim has merit.  *See Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168 (N.D. Cal. 2009) ("The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim.").  The Court has determined that a reasonable jury could find Perez used unreasonable force in violation of Serrano's constitutional rights.

Additionally, "the Bane Act requires a 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'"  *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 800 (2017), as modified (Nov. 17, 2017)).  To show such intent, a plaintiff need only demonstrate a "reckless disregard" for the constitutional right at issue.  *Id.* at 1045.  As explained above, under Plaintiffs' narration of the facts, Perez knowingly used deadly force on Serrano while Serrano was surrendering to the Deputies with his visibly empty hands in the air.  A

1    reasonable jury could find that Perez's actions demonstrate a reckless disregard for

2    Serrano's constitutional right to be free from excessive force.  Accordingly, summary

3    judgment is not appropriate on the Bane Act claim.   The Court thus **DENIES**

4    summary judgment as to Plaintiffs' state law claims on this basis.

5        *3.    Plaintiff Miranda's Failure to File a Government Claim*

6        Defendants next contend that Miranda's state claims—which she asserts

7    individually and as a successor in interest to Serrano—are barred as a matter of law

8    because she failed to first file a claim for money damages with the government,

9    pursuant to California Government Claims Act.  (Mot. 23.)

10       "The Government Claims Act provides that 'all claims for money or damages

11   against local public entities,' . . . must be presented to those entities." *Garcia v. City*

12   *of Los Angeles*, No. 19-cv-06182-DSF (PLAx), 2020 WL 2129830, at *9 (C.D. Cal.

13   Feb. 15, 2020) (quoting Cal. Gov't Code § 905).  "[N]o suit falling into this category

14   may be brought 'until a written claim therefor has been presented to the public entity

15   and has been acted upon by the board, or has been deemed to have been rejected by

16   the board.'"  *Id.* (quoting Cal. Gov't Code § 945.4)).   Here, Plaintiffs argue that,

17   although Miranda did not file a claim in her name, Plaintiff Serrano Robles, Sr. did,

18   and the substance of the claim is the same for them both and should prevail over any

19   deficiency in the form.  (Opp'n 20.)  However, Defendants are correct that this is not

20   the law, at least as to the state law claims Miranda brings individually.  (Reply 14.)

21       "Where two or more persons suffer separate and distinct injuries from the same

22   act or omission, each person must submit a claim, and one cannot rely on a claim

23   presented by another." *Nelson v. County of Los Angeles*, 113 Cal. App. 4th 783, 796

24   (2003).   Because the Act's filing requirement is intended "to provide sufficient

25   information to enable the entity to adequately investigate claims . . . the statutory

26   requirements have not been met by the person who has not filed a claim."  *Id.* at 797.

27   "This rule applies where different claimants are alleging survivor theories and

28   wrongful death theories of liability arising from the same transaction." *Castaneda v.*

*Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1062 (2013).  Accordingly, "the doctrine of substantial compliance (which applies only when there is a defect in form but the statutory requirements have otherwise been met) does not apply" to Miranda's state claims as asserted individually.  *Nelson*, 113 Cal. App. 4th at 796.  Similar to *Nelson* "the problem here is not that Plaintiffs' government forms were defective, but rather that no government claim at all was filed."  *Abrego v. City of Los Angeles*, No. 15-cv-00039-BRO (JEM), 2016 WL 9450679, at *10 (C.D. Cal. Sept. 23, 2016).

However, the Court finds that Miranda's state law claims asserted as Serrano's successor in interest, are neither separate nor distinct from those claims Serrano Robles Sr. also asserted as Serrano's successor in interest.  Thus, the Court **GRANTS** Defendants' Motion for summary judgment on Miranda's seventh through ninth state law claims as asserted individually and **DENIES** Defendants' Motion for those same claims insofar that Miranda asserts them as Serrano's successor in interest.

## VI.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** in **PART** and **DENIES** in **PART** Defendants' Motion for Summary Judgment.  (ECF No. 55.)  Specifically, the Court **GRANTS** Defendants' Motion as to: (1) the denial of medical care theory of Plaintiffs' first claim against Perez and the County; (2) Plaintiffs' third claim against Villanueva for supervisory liability; and (3) Plaintiff Miranda's seventh through ninth state law claims insofar as she asserts them individually.  The Court **DENIES** Defendants' Motion as to all other claims.

**IT IS SO ORDERED.**

July 18, 2022

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**